## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: | Bankruptcy Case No. 25-14914-JGR |
| ROBERT M. KOFFLER, | Chapter 11 |
| | |
| In re: | Bankruptcy Case No. 25-15985-JGR |
| | (Jointly Administered) |
| MAITE, LLC, | Chapter 11 |
| | |
| Debtors.[1] | |

---

## JUDGMENT CREDITORS' *LIMITED* OBJECTION TO JOINTLY ADMINISTERED DEBTOR MAITE, LLC'S APPLICATION TO EMPLOY O'HAGAN MEYER AS SPECIAL COUNSEL PURSUANT TO 11 U.S.C. § 327(E)

---

Judgment Creditors, Reinsurance Partners Investments, LLC, Tri-Cap Holdings, LLC, and 530 Mashta, LLC ("Judgment Creditors"), pursuant to 11 U.S.C. § 327, object to Maite, LLC's ("Debtor") *Application to Employ O'Hagan Meyer, PLLC as Special Counsel* [ECF No. 14] ("Application").

1.      Judgment Creditors hold a $22,451,109.02 final, non-appealable judgment against the Debtor entered on June 27, 2025, after a 5-day bench trial before the Chief District Court Judge in the U.S. District Court for the Southern District of Florida. Judgment Creditors attach a copy of the Final Judgment as ***Exhibit A***.

2.      Through the Application, the Debtor seeks to employ O'Hagan Meyer, PLLC ("OM") as special counsel to represent the Debtor in the LIT Matters, as defined in the Application. *See* ECF No. 14.

---

[1] This *Limited Objection* is directed at an Application originally filed by debtor Maite, LLC in jointly administered Case No. 25-15985 at ECF No. 14, which was filed prior to entry of the Court's Order jointly administering these cases.

3.      The Debtor also seeks to compensate OM on an hourly basis from the estate when the estate has no money and no ability to generate income because the Debtor is a non-operating holding company. *See* ECF Nos. 1, 14.

4.      Judgment Creditors submit this *limited* objection to the Application because they understand that the Debtor desires OM to represent it in the LIT Matters but do not agree that its bankruptcy estate should pay for such representation because it is not in the "best interests of the estate" as section 11 U.S.C. § 327(e) requires. *See* 11 U.S.C. § 327(e); *In re Potter*, No. 7-05-14071 MA, 2009 Bankr. LEXIS 2900, at *6 (Bankr. D.N.M. June 12, 2009).

5.      Judgment Creditors attach as ***Exhibit B*** a copy of the complaint OM filed on behalf of the Debtor against Lera Investment Technologies, Inc. ("LIT") in the Delaware Chancery Court on September 5, 2025, in which the Debtor seeks to inspect certain of LIT's books and records pursuant to Delaware General Corporation Law § 220 ("Section 220"). The Debtor, in the Section 220 complaint, does not seek damages because that section does not provide such relief.

6.      The Application itself and the Section 220 complaint, even more so, show if the Debtor wins the Section 220 action, which is unlikely due to multiple defenses, including seeking records for an improper purpose, that win would not cause money to flow into the Debtor's estate for use in a chapter 11 plan.

7.      The court in *In re Potter*, focused on the burden the special counsel retention would impose upon the estate and approved the engagement under modified compensation arrangement. *In re Potter*, 2009 Bankr. LEXIS 2900, at *9 ("The contemplated fees are too much of a burden on the estate" when the fees at issue were between $15,000 and $20,000).[2]

---

[2] Here, the Application shows that OM is writing off $8,500 already and OM just filed the Section 220 complaint. *See* ECF No. 14.

106103686.1

8.      Judgment Creditors object to the Application because there are no funds in the Estate and the proposed litigation will not generate revenue for the estate. If the Court grants the application and OM is retained and permitted to seek compensation from the estate that request would be at the administrative priority level and potentially dilute creditors without contributing any offsetting economic benefit.. *See* 11 U.S.C. §§ 503(b)(2), 507(a)(2). The problem would compound by potentially impeding plan confirmation if the Debtor did not have sufficient cash on hand to pay administrative expenses upon the effective date of the confirmed plan as required by § 1129(a)(9)(A). *See* 11 U.S.C. § 112(a)(9)(A).

9.      The Debtor cannot meet its burden of proof required for the Court to grant the Application. *See Decloutte v. Austin (In re Decloutte)*, Nos. 14-35557, 12-35092, 16-3275, 17-3237, 2018 Bankr. LEXIS 1869, at *40 (Bankr. S.D. Tex. June 20, 2018) (finding that the applicant seeking to retain special counsel bears the burden of proof under § 327(e)). These facts, therefore, compel denial of the Application for failure to satisfy the benefit element of the § 327(e) test. *See* 11 U.S.C. § 327(e).

10.     But the Debtor and OM could solve this problem if they agree that OM will be retained but not compensated by the estate and any third-party paying OM's fees would agree to never seek compensation from the estate either in chapter 11 administration or chapter 7 administration if the case is ever converted. Of course, the Debtor and OM would need to disclose compensation sources pursuant to Fed. R. Bank. P. 2016(b) and L.B.R. 2016-1. *See In re Dayton Dev. Partners, LLC*, No. 25-30699, 2025 Bankr. LEXIS 1900, at *35 (Bankr. S.D. Ohio Aug. 4, 2025); *In re Core Communs., Inc.*, No. 17-00258, 2017 Bankr. LEXIS 3846, at * 5-6 (Bankr. D.D.C. Nov. 5, 2017). If the Debtor and OM agree to such an arrangement, the Court should reserve jurisdiction to require OM to seek approval from the Court pursuant to §§ 330 and 331,

Fed. R. Bankr. P. 2016, and L.B.R. 2016-1, notwithstanding the source of payment being from a third-party. *See In re Dayton Dev. Partners, LLC*, 2025 Bankr. LEXIS 1900, at *35.

WHEREFORE, Judgment Creditors request the Court sustain this objection and disapprove the Application.

Dated: September 22, 2025.

Respectfully submitted,

POLSINELLI PC

By: */s/ Michael L. Schuster*
Michael L. Schuster, Esq.
1401 Lawrence Street, Suite 2300
Denver, CO 80202
Telephone: (720) 931-1188
Email: mschuster@polsinelli.com

*Local Counsel for Judgment Creditors,* Reinsurance Partners Investments, LLC, *Tri-Cap Holdings, LLC and 530 Mashta, LLC*

DAMIAN | VALORI | CULMO

Melanie E. Damian
Florida Bar Number 99392
mdamian@dvllp.com
Kristopher E. Pearson
Florida Bar Number 16874
kpearson@dvcattorneys.com
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile:  (305) 371-3965

*Lead Counsel for Judgment Creditors,* Reinsurance Partners Investments, LLC, *Tri-Cap Holdings, LLC and 530 Mashta, LLC*

106103686.1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 22, 2025, the foregoing *Limited Objection* was filed through the Court's CM/ECF service, which will generate and transmit a Notice of Electronic Filing on all parties registered to receive such notices in this case.

By: */s/ Michael L. Schuster*

106103686.1

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 24-22563-CIV-ALTONAGA/Reid
### CONSOL. CASE NO. 24-22865-CIV-ALTONAGA/Reid

**REINSURANCE PARTNERS,
INVESTMENTS**, *et al.*,

      Plaintiffs,

v.

**MAITE LLC**, *et al.*,

      Defendants.

_____/

## <u>ORDER</u>

**THIS CAUSE** came before the Court for non-jury trial beginning on May 27, 2025 and continuing on May 28, June 2, June 3, and June 11, 2025. (*See generally* Minute Entries [ECF Nos. 112, 113, 115, 116, 117]). The issues having been duly tried, the Court announced its Findings of Fact and Conclusions of Law on the record in open court on June 12, 2025. (*See* June 12, 2025 Order [ECF No. 118]). The Court now enters final judgment separately, under Federal Rule of Civil Procedure 58. Accordingly, it is

**ORDERED AND ADJUDGED** as follows:

1. Final Judgment is entered on Counts I and II of the Complaint [ECF No. 1] in favor of Plaintiff, **Reinsurance Partners Investments, LLC**, whose address is 1441 Brickell Ave, Suite 1210, Miami, FL, 33131; against Defendant **Maite, LLC**, whose last known address is 1111 Brickell Ave, Suite 2750, Miami, FL, 33131, in the amount of **$5,304,093.74**, which shall bear post-judgment interest at the statutory rate provided for by 28 U.S.C 1961, and for which sum let execution issue.

2. Final Judgment is entered on Counts I, II, and III of the Complaint ([ECF No. 1], Consol. Case No. 24-cv-22865) in favor of Plaintiff, **Tri-Cap Holdings, LLC**, whose address is 1441 Brickell, Suite 1210, Miami, Florida 33131, jointly and severally against Defendant **Maite, LLC**, whose last known address is 1111 Brickell Ave, Suite 2750, Miami, FL, 33131, and Defendant **Robert M. Koffler**, whose address is 115 Blue Spruce Lane, Snowmass Village, Colorado, 81615, in the amount of **$7,536,802.00**, which shall bear post-judgment interest at the statutory rate provided for by 28 U.S.C 1961, and for which sum let execution issue.

3. Final Judgment is entered on Counts I, II, and III of the Complaint ([ECF No. 1], Consol. Case No. 24-cv-22865) in favor of Plaintiff, **530 Mashta, LLC**, whose address is 6952 SW 47th Street, Unit 6952, Miami, Florida 33155, jointly and severally against **Defendant Maite, LLC**, whose last known address is 1111 Brickell Ave, Suite 2750, Miami, FL, 33131, and Defendant **Robert M. Koffler**, whose address is 115 Blue Spruce Lane, Snowmass Village, Colorado, 81615, in the amount of **$9,610,213.28**, which shall bear post-judgment interest at the statutory rate provided for by 28 U.S.C 1961, and for which sum let execution issue.[1]

4. Final Judgment is entered on Counts VI and VII of the Complaint ([ECF No. 1], Consol. Case No. 24-cv-22865) in favor of Plaintiff, **530 Mashta, LLC**, whose address is 6952 SW 47th Street, Unit 6952, Miami, Florida 33155, against Defendant, **RMK Ngena, LLC**, whose last known address is 1111 Brickell Ave, Suite 2750, Miami, FL, 33131, in the amount of **$2,374.308.30**, which shall bear post-judgment interest at the statutory rate provided for by 28 U.S.C 1961, and for which sum let execution issue.

5. All other claims asserted by Plaintiffs against Defendants are **MOOT**.

---

[1] For this figure, the Court employs the sum provided in the Proposed Final Judgment [ECF No. 120].

6. Defendant/Counter-Plaintiff **Maite, LLC** shall take nothing from Plaintiff/Counter-Defendant **530 Mashta, LLC,** and Counts I and II of its Amended Counterclaim [ECF No. 38] against this Plaintiff/Counter-Defendant are **DISMISSED**, *with prejudice.*

7. The Court directs Defendants Maite, LLC, and RMK Ngena, LLC to complete the Form 1.977(b) Fact Information Sheet for Corporations and Other Business Entities, as provided by the Florida Rules of Civil Procedure. Defendant Robert M. Koffler is directed to complete the Form 1.977(a) Fact Information Sheet for Individuals, as provided by the Florida Rules of Civil Procedure. All Defendants must provide the completed sworn 1.977 Fact Information Sheets, and all necessary documents, to Plaintiffs' counsel within 45 days from the date of entry of this final judgment, by mail to 1000 Brickell Ave, Suite 1020, Miami, Florida, 33131, and by email to counsel Melanie E. Damian, Esq. at [mdamian@dvllp.com](mailto:mdamian@dvllp.com) and Kristopher E. Pearson, Esq. at [kpearson@dvcattorneys.com](mailto:kpearson@dvcattorneys.com), unless this Final Judgment is satisfied before then.

8. Judgment shall be enforceable as prescribed by Federal Rules of Civil Procedure 64, 66, 69, 70.

9. For purposes of the 30-day automatic stay of judgments provided by Federal Rule of Civil Procedure 62(a), this Final Judgment shall be deemed effective as of June 27, 2025, meaning that the 30-day stay on execution of this Judgment shall expire on July 28, 2025.

10. Plaintiffs are entitled to recover attorneys' fees and costs against Defendants under their written credit agreements. Requests for attorneys' fees and costs shall not be submitted until after any post-trial motions are decided or any appeal is concluded, whichever occurs later.

11. The Clerk is directed to **CLOSE** the case. Nonetheless, the Court retains jurisdiction over this cause and over the parties for the purpose of entering all further post-judgment orders that are just and proper.

CASE NO. 24-22563-CIV-ALTONAGA/Reid

**DONE AND ORDERED** in Miami, Florida, this 27th day of June, 2025.

_Cecilia M. Altonaga_
**CECILIA M. ALTONAGA**
**CHIEF UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

EFiled:  Sep 05 2025 01:36PM EDT
Transaction ID 77007993
Case No. 2025-1009-

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MAITE LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2025- |
| | ) | |
| LERA INVESTMENT | ) | |
| TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## VERIFIED COMPLAINT UNDER 8 *DEL. C.* § 220

1.      This is an action to enforce the inspection rights of Maite LLC ("Maite" or "Plaintiff"), a stockholder of record in Lera Investment Technologies, Inc. ("LIT" or "Defendant"), a Delaware Corporation.

2.      The Court has subject matter jurisdiction pursuant to 8 *Del. C.* § 220.

### *The Parties and Other Important Persons*

*Maite*

3.      Maite is completely owned by Robert Koffler ("Koffler"), the founder and former director and Chief Executive Officer of LIT.

4.      Following misrepresentations by Camilo Montana and Gabriel Holschneider, two directors and indirect stockholders of LIT, Maite's ownership

#8651906v1

interest was severely diluted by approximately 99.5%.  Nevertheless, Maite remains a stockholder of record.

*LIT*

5.      LIT is based in Miami, Florida.  The Company specializes in providing financial resources for technology service providers, focusing on the transition to as-a-service models within the information technologies ("IT") sector. The company offers IT-as-a-Service solutions, including Infrastructure as a Service (IaaS) and Device as a Service (DaaS), which encompass a range of services from deployment to disposal under flexible consumption contracts. LIT primarily serves systems integrators, service providers, and technology manufacturers, facilitating their shift to flexible, scalable, and cost-effective IT service delivery.  Most of the Company's clients are Fortune 500 companies.

6.      In a report dated June 30, 2022, financial advisor DBO Partners, LLC valued the Company at a range of $243 million to $2 billion, based on various assumptions and using a variety of valuation methods.

7.      According to sworn statements by directors Camilo Montana ("Montana") and Gabriel Holschneider ("Holschneider"), the Company has lost two-thirds of its value over the last two years.

*Koffler*

8.     Koffler was the sole founder of LIT, and served as its Chairman and CEO from its beginning through December 2022, when he stepped down to allow an outside CEO to run the Company.  From December 2022 through June 17, 2024, Koffler served as LIT's Head of Capital Markets and Funding Facilities.  He also remained Chairman of the Board until December 2023, and continued to serve as a director of LIT and several of its subsidiaries.

9.     At the time Koffler stepped down as CEO, LIT had already grown its banking facilities to approximately $1 billion.  In 2023, the Company continued to add to its financial resources through deals negotiated by Koffler beginning in 2022. For example, in or around December 2022, LIT closed a $600 million banking facility with Santander Bank.  In or around June 2023, the Company raised the first $15 million of institutional equity funding from Kickstart Fund "Kickstart").  In or around December 2023, LIT began negotiating with Accenture, Google, and McDonald's concerning a potential billion-dollar IaaS facility.

*RevTek*

10.     RevTek Capital ("RevTek") is an asset manager based in Phoenix that specializes in tailored credit solutions for growing software-as-a-service ("SaaS") and tech-enabled companies.  Revtek also has offices in Chicago, Miami, and Naples.  RevTek presented a $20 million loan proposal to LIT in July 2025, which

contemplates the settlement of litigation between Koffler and LIT and Montana and Holschneider, and Koffler's return to the Company as its Chairman.

### ***Background***
### *The Personal Animus Against Koffler*

11.     In approximately 2016, Montana and Holschneider, through their respective controlled entities Mashta and Tri-Cap, bought out all investors other than Koffler.   Following these purchases, Montana, Holschneider, and Koffler each owned one-third of the Company until Kickstart's investment in June 2023.

12.     As the founder and "working partner," Koffler continued to make strategic and day-to-day operational decisions for the Company, with Montana and Holschneider providing funding and other support.

13.     While maintaining their one-third equity interests, the three stockholders entered into separate interpersonal and/or intercorporate loans.  Loans made to Koffler and Maite were secured by shares of companies owned and operated by Maite, including LIT.

14.     In fall 2023, Koffler assigned shares held by Maite to Montana, based on representations by Montana that, among other things, (i) Montana needed financial assistance to avoid losing his home, (ii) the shares would be held by Montana but owned by Koffler during a three-year period during which Koffler could terminate the assignment by satisfying his debts to Montana and Holschneider, and (iii) Montana would not execute on the assignment during this same period.  The

#8651906v1

second two representations were knowingly false, as Montana had no intention of honoring this arrangement after preventing the foreclosure of the mortgage on his home.

15.    In late March 2024, Koffler learned that contrary to Montana's earlier representations, he had converted the assigned shares for no consideration, resulting in Montana and Holschneider purportedly owning approximately 99.5% of the LIT shares previously owned by Maite.

16.    In the next few months, Koffler attempted unsuccessfully to settle his stockholder dispute with Montana and Holschneider.  On June 7, 2024, Montana and Holschneider asked Koffler for a written list of all of his disputes with them regarding LIT and other matters, which Koffler provided on June 11, 2024.  As part of this assessment, Koffler informed the two that he believed his dispute with them was material information that should be disclosed not only to all existing stockholders (not limited to Kickstart), but all potentially interested persons doing business with or investing in LIT, whose assumption was that Koffler continued to have a substantial ownership interest in the Company.   In particular, new stockholders and investors were scheduled to make contributions of capital to LIT in late June 2024.  In addition, following Kickstart's June 2023 investment in LIT, other persons have invested capital and become stockholders.

#8651906v1

17.     On June 13, 2024, Koffler informed Montana and Holschneider that he believed LIT's continuing failure to disclose material information could result in possible criminal or civil violations of Section 17(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5.  Koffler advised Montana and Holschneider that he intended to report this information to the Company's auditors, bankers, and stockholders if LIT did not.

18.     On June 17, 2024, Koffler was terminated from his executive position as Head of Capital Markets and Funding Facilities and informed that he had been removed as a director of LIT.  Koffler was so advised by a letter from LIT's CEO, John Sepple.  However, the letter did not include any stockholder resolution or stockholder action by written consent.

19.     Koffler's termination and purported removal, and the dilution of Maite's ownership interest in LIT, are not subjects of this summary action to enforce Maite's statutory and common law rights to inspect the Company's books and records.  They are provided as background information concerning personal animus against Koffler held by directors Montana and Holschneider.  Koffler does not currently seek an inspection of the Company's books and records concerning his disputes with those two individuals or his termination and alleged removal.

*The Proposed RevTek Loan*

20.     Notwithstanding his termination from LIT, Koffler continued to worry about the Company's financial stability, stewardship, and in particular, its ability to attract new capital investment without the involvement of its founder.

21.     On July 11, 2025, RevTek presented to LIT a $20 million loan proposal, subject to certain conditions precedent.  Among the conditions precedent were the settlement of all litigation between Koffler, the Company, and other LIT stockholders.

22.     The RevTek proposal also provided that RevTek would be entitled to appoint a director and that Koffler would return as Board Chairman.  In addition, Koffler requested an in-person meeting with the principals of Kickstart.

23.     The LIT Board initially failed to provide any substantive response or counter to the proposal.

24.     On July 22, 2025, RevTek again presented the same written proposal to LIT.

25.     On July 25, 2025, LIT suggested to RevTek that it would be willing to discuss a deal with RevTek that did not involve Koffler, with whom the Company was involved in whistleblower litigation.

26.     By email dated August 4, 2025, a RevTek representative responded:

I understand your reluctance to send confidential information to RevTek to be shared with Mr Koffler considering the on-going

litigation. However, Mr Koffler suggested revisiting this opportunity to RevTek and would be a critical part of our diligence and operations going forward. That said, we have been clear that we will not make any investment until the litigation is settled. However, we remain very interested in investing in LIT so suggest a different track. Let's hold off on our diligence/data request until you have had a chance to have substantive negotiations on settlement. When you get to the point where you are comfortable that a settlement is close, we can re-engage with all parties and move forward quickly towards an investment.

27.     Koffler has not heard from Montana, Holschneider, or LIT regarding the settlement of litigation between himself and them.

*The Inspection Demand*

28.     On August 4, 2025, Maite presented a demand to the LIT Board of Directors for an inspection of the basic set of books and records referenced in 8 *Del. C.* § 220(a)(1).  (Exhibit 1).

29.     The stated purposes for the inspection were:

(1) to value Mr. Koffler's stock; (2) to evaluate the disinterestedness and independence of LIT's directors and officers; (3) to assess and evaluate the LIT Board's actions, if any, with respect to the $20 million loan; (4) to investigate potential corporate wrongdoing by management, which Mr. Koffler suspects based on, among other things, (i) the facts alleged in his complaint against LIT under the Florida Whistleblower Act, (ii) the loss of 66% of LIT's value within two years attested to by directors Gabriel Holschneider and Camilo Montana, and (iii) the Board's apparent decisions to first ignore and later hinder a $20 million loan proposal; and (5) to take action in the event any directors and/or officers did not properly discharge their fiduciary duties, including but not limited to Mr. Koffler sending a litigation demand letter or the preparation and filing of a stockholder lawsuit, if appropriate.

30.    Koffler also stated that he was willing to discuss an appropriate narrowing of his demand and to enter into a standard, reasonable confidentiality agreement.

31.    In addition to his inspection demand, Koffler observed in his letter that RevTek's condition precedent that all litigation with Koffler be settled created a conflict of interest for directors Montana and Holschneider, who would have a motive to trade valuable terms in exchange for RevTek withdrawing that condition from its proposal.  Koffler advised that the LIT Board should create a committee of disinterested and independent directors for the purposes of settling litigation between Koffler and LIT and negotiating a deal with RevTek.

32.    On August 5, 2025, Koffler filed for protection under Chapter 11 of the Bankruptcy Code and Maite is expected to file its own petition within the next few days.  These filings were necessary to preserve the assets of the bankruptcy estate from a judgment purportedly issued against Koffler and Maite in a Florida court. Koffler and Maite will be filing a motion for relief from the judgment based on subsequently discovered evidence of fraud and perjury.

*The Company's Initial Response*

33.    On August 8, 2025, counsel to LIT responded to Koffler's inspection demand.  (Exhibit 2).  The Company produced LIT's certificate of incorporation and bylaws, and certain audited and preliminary financial statements.  Significantly, the

Company did not provide any minutes of meetings of the Board of Directors or actions taken by the Board by written resolutions. Nor did LIT provide director and officer independence questionnaires, stockholder agreements, minutes of stockholder meetings or written consents evidencing stockholder actions, or communications made to all LIT stockholders.

34.    The Company's first excuse for failing to provide the requested records was that Koffler's demand failed to state a proper purpose for inspection. The Company did not suggest that any of Maite's stated reasons for inspection was not proper. Rather, LIT asserted that the primary purpose for the requested inspection was "to gather information for use in personal or employment-related disputes of Mr. Koffler." This professed concern of LIT would be addressed in subsequent correspondence.

35.    The second excuse proffered by LIT for not providing an inspection was that Koffler's demand supposedly was overbroad and "an improper attempt to conduct a fishing expedition, rather than a good faith, narrowly tailored request for inspection."

36.    Yet Koffler did not demand a search of all directors' emails, as demands made under Section 220 often do. The demand was limited to the core documents listed in Section 220(a)(1), all of which should be readily available to a corporate secretary or similar custodian of the corporation's books and records, and virtually

all of which are noncontroversial and whose substance must generally be disclosed under federal securities laws.

37.    And, while a "credible basis" to suspect wrongdoing need not be established in the demand letter itself, Koffler had nonetheless stated three reasons for his suspicion.  LIT is on the brink of insolvency, which heightens the importance of Koffler's inspection demand.

38.    LIT went on to say in its response that it was willing to consider providing "a narrow set of non-privileged documents," provided they were "narrowly tailored to documents not already in Koffler's possession from his time on the Board,[1] and only after execution of a Nondisclosure and Confidentiality Agreement."

39.    LIT then went on to make a series of false statements, some of which were at least arguably, knowingly false.  Among other things, LIT "categorically denied" any conflict of interest of any director without any explanation or, of course, independence questionnaires.  In addition, the response stated that "the Board of Directors has reviewed the loan offer and LIT's management has engaged in discussions to further evaluate the terms of the loan offer."  But this cannot have

---

[1] This was an odd request by LIT, *see generally* 8 *Del. C.* § 220(d).  Other than independence questionnaires and records concerning communications to stockholders, stockholder meetings, and stockholder actions by written consent, all remaining books and records for which an inspection is sought are limited to those concerning the Board's response to the RevTek proposal.

been true in any meaningful sense.  First, no one contacted Koffler to discuss the terms of a settlement, or to arrange a meeting with the principals of Kickstarter.  Second, the only response to RevTek was an attempt to remove the condition precedent requiring a settlement with Koffler.

40.    LIT also ignored Koffler's suggestion that the LIT Board establish a committee of disinterested and independent directors and implicitly rejected it through the assertion that none of its directors had any potentially disabling conflict of interest.  LIT would later observe that the nomination of a committee is committed to the Board's discretion and not properly the subject of a Section 220 action.  This is true as far as it goes, and this action does not seek an order requiring the appointment of a committee.   However, the Board's stubbornness over such a mundane request both evidences that it is unlikely to provide the required inspection absent judicial intervention, and that Koffler's fears that the process of responding to the RevTek proposal has been tainted are well founded.

*The Company's "Second Response"*

41.    On August 20, 2025, Koffler, through counsel, responded to the points made in the Company's August 8 response.  (Exhibit 3).  Koffler noted that the Company had failed to address his request for minutes of stockholder meetings or stockholder actions by written consent, as well as written communications to all stockholders.  Koffler confirmed that LIT had not provided any board minutes or

other Board-level documents indicating any attention paid to the proposal from RevTek, or any of the standard conflict questionnaires filled out by directors and officers. Koffler also acknowledged LIT's statement that he had a "wrongful" purpose for inspection, i.e., an attempt to obtain discovery for a lawsuit filed against the Company under the Florida Whistleblower Act. Koffler explained that his inspection would be limited to books and records related to the RevTek proposal (all of which by necessity would be limited to a narrow period after Koffler had purportedly been removed from the LIT Board), and offered that he was willing to stay his whistleblower action in favor of the books and records inspection and/or dismiss it as part of a settlement to facilitate negotiations with RevTek. Koffler reiterated that he was willing to enter into a standard, reasonable confidentiality agreement in connection with the inspection.

42.     At this point, all of the alleged "concerns" raised by LIT in its August 8, 2025 response had been dealt with.

43.     Nevertheless, on August 27, 2025, counsel to LIT sent what it characterized as a "second response" to the demand. (Exhibit 4). The so-called second response did not acknowledge Koffler's narrowing of his demand, did not address any of Koffler's stated purposes for inspection, repeated that the primary purpose for inspection was improper without addressing how Koffler had mooted that concern, again failed to address at all entire categories of requested books and

records, conflated stockholder meeting minutes and written consents with board meeting minutes and written consents, and suggested (incorrectly) that independence questionnaires somehow "exceed the scope" of a 220 action despite being specifically enumerated in the statute.

44.     Although Koffler does not seek an order in this action requiring LIT to hold an annual meeting of stockholders, the reason for LIT's obstinance in confirming the absence of stockholder records seems self-evident.  *See generally* 8 *Del C.* § 211(c).

## *The Requirements of Section 220 Have Been Satisfied*

45.     The general requirements of a Section 220 demand are technical but straightforward.  First a written demand must be made "under oath."  8 *Del. C.* § 220(b)(1).  Second, the demand must be made in good faith and for a proper purpose. 8 *Del. C.* § 220(b)(2)(a).  Third, the demand must describe with reasonable particularity the stockholder's purpose and the books and records the stockholder seeks to inspect.  8 *Del. C.* § 220(b)(2)(b).  Fourth, the demand must seek books and records specifically related to the stockholder's purpose.  8 *Del. C.* § 220(b)(2)(c). Fifth, if the stockholder is not a stockholder of record, the demand must be accompanied by verified documentary evidence of beneficial ownership. 8 *Del. C.* § 220(b)(5).  Sixth, if an attorney or other agent of the stockholder seeks the

inspection, the demand must be accompanied by a written power of attorney.  8 *Del. C.* § 220(b)(6).

*The demand was made under oath by a stockholder of record*

46.    As previously stated, Maite LLC is a stockholder of record.  Maite made the demand under oath through Koffler, who is an officer of Maite.

*The demand included a power of attorney*

47.    The demand included Koffler's written power of attorney authorizing the undersigned counsel to conduct the inspection.

*The demand stated a proper purpose for inspection*

48.    The demand stated five purposes for inspection, each of which has been recognized as a proper purpose under Delaware law.

*The demand was limited to Board-Level materials that are necessary and sufficient to satisfy the purposes of the inspection*

49.    The demand did not exceed the basic books and records enumerated in the statute.  *See* 8 *Del. C.* § 220(a)(1).

50.    In addition, Koffler through further correspondence narrowed his inspection to a discrete set of Board-level documents, as well as standard independence questionnaires and stockholder-related records.

*The Plaintiff does not seek an inspection for an improper purpose*

51.    Koffler has acknowledged LIT's concern that Koffler might seek information for use in other litigation.  Of course, the conditions precedent of the

RevTek proposal include the settlement of all such litigation.  Nonetheless, Koffler has narrowed his demand for Board-level information to minutes (or their functional equivalent) relating to the Board's response to the RevTek proposal.  Regardless, this is a concern easily addressed in the terms of whatever confidentiality agreement is agreed to by the parties.

**THEREFORE,** Plaintiff respectfully requests that the Court enter an order:

(i)     requiring the Defendant to provide LIT Board minutes (or their functional equivalent) regarding the LIT Board's discussion of and response to the RevTek proposal, as well as any bona fide funding offers that are currently actionable;

(ii)    requiring the Defendant to provide LIT's director and officer independence questionnaires for the last two years;

(iii)   requiring the Defendant to provide all minutes of LIT's stockholder meetings and/or stockholder actions by written consent during the past two years;

(iv)    requiring the Defendant to provide all communications sent to all LIT stockholders during the past two years;

(v)     awarding Plaintiff all fees and expenses, including a reasonable award of attorneys' fees; and

#8651906v1

(vi)   awarding any other relief that the Court believes is reasonable and just.

Respectfully,

*/s/ Stephen D. Dargitz*
Stephen D. Dargitz (No. 3619)
O'HAGAN MEYER PLLC
800 North King Street, Plaza Suite 1
Wilmington, DE 19801
(302) 492-2150
sdargitz@ohaganmeyer.com

September 5, 2025

#8651906v1